# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 20, 2013 Session

## STATE OF TENNESSEE v. HEATHER McMURRAY

**Appeal from the Criminal Court for Knox County**
**No. 95356     Jon Kerry Blackwood, Judge**

---

**No. E2012-02637-CCA-R3-CD - Filed December 16, 2013**

---

The defendant, Heather McMurray, was convicted by a Knox County Criminal Court jury of three counts of the sale of less than .5 grams of cocaine within 1000 feet of a school zone, three counts of the delivery of less than .5 grams of cocaine within 1000 feet of a school zone, possession of less than .5 grams of cocaine with the intent to sell within 1000 feet of a school zone, and possession of less than .5 grams of cocaine with the intent to deliver within 1000 feet of a school zone, all Class B felonies. The trial court merged the convictions based on the same incidents and sentenced the defendant as a Range I, standard offender to concurrent terms of twelve years for each conviction, with a mandatory eight-year sentence in the Department of Correction due to the fact that the offenses were committed in a drug-free school zone. The defendant raises three issues on appeal: (1) whether the evidence is sufficient to sustain her convictions; (2) whether the trial court erred in allowing a police officer to testify as an expert witness; and (3) whether the trial court erred by denying her motion for a mistrial after the State played a redacted version of her statement to police. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and ROGER A. PAGE, J., joined.

Mike Whalen, Knoxville, Tennessee, for the appellant, Heather McMurray.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Phillip Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTS

In July 2010, a confidential informant working for the Knoxville Police Department made three controlled drug buys of crack cocaine from the defendant at her Knoxville apartment. The defendant was arrested and her apartment searched, which resulted in the discovery of a small amount of crack cocaine and some drug paraphernalia. The Knox County Grand Jury subsequently returned a nine-count indictment charging the defendant with three counts each of the sale and delivery of less than .5 grams of cocaine within 1000 feet of a school zone, possession of less than .5 grams of cocaine with the intent to sell and deliver within 1000 feet of a school zone, and possession of drug paraphernalia. The defendant pled guilty to the drug paraphernalia charge and proceeded to trial on the remaining counts of the indictment.

The State's first witness at trial was the confidential informant, who testified that for the past five years he had occasionally worked as an informant for the Knoxville Police Department by purchasing drugs from individuals about whom the police department had received complaints. He estimated that he had engaged in 90 to 100 such transactions during that time and said that he was paid in cash for each transaction. He had not, however, been paid for his testimony against the defendant. He acknowledged that he had some criminal history himself, having been convicted of aggravated assault and "some misdemeanors."

The confidential informant testified that in June 2010, Investigator Jinks of the Knoxville Police Department asked him to attempt to purchase some crack cocaine from the defendant, whom he had not previously known. He explained that Investigator Jinks had him do what was called a "cold walk-up," in which he would approach someone about whom the department had received a drug complaint and attempt to strike up a conversation to see if he could buy whatever it was the person was alleged to be selling. Using that procedure, he met the defendant sometime in June, and she gave him her telephone number. On July 2, 2010, he conducted the first of three controlled buys from her. The confidential informant described the procedure employed during each controlled buy, testifying that he would meet the officers at a predetermined location for them to search him and give him $40 in cash for the drug purchase and outfit him with a transmitter and recorder, drive to the defendant's home in his vehicle while the officers accompanied and monitored him in separate unmarked vehicles, make the drug purchase, and then meet the officers again at the predetermined location to give them the drugs and be searched again. He said he was paid $100 for each of the transactions. The confidential informant identified the audio recordings of the three drug transactions, which were played for the jury and admitted as exhibits. During the playing of the recordings, he narrated for the jury what was happening.

The confidential informant testified that during the July 2 transaction he knocked on the defendant's door, asked the man who answered whether the defendant was home, and was told that she was not. He said he encountered the defendant as he was leaving the porch, and they had a discussion about his buying "40," or $40 worth of crack cocaine from her. She left to go get it, and he waited on the porch until she returned approximately twenty to forty-five minutes later. He said she gave him the crack cocaine that was in her hand, along with "a little bit extra" from the table because he had had to wait so long. He then drove back to the predetermined spot to turn over the drugs to Investigator Jinks.

The confidential informant testified that during the next transaction on July 5 he encountered the defendant as he was getting back into his vehicle at her residence after knocking on the door and being informed that she was not there. He said he asked her if she had found any and mentioned a "40," meaning $40 worth of crack cocaine. He stated that she told him to come around to the front and when he did so, she walked to someone inside a vehicle in front of her residence, retrieved the drugs, and brought them to him. He paid her and then returned to the predetermined location to turn the drugs over to Investigator Jinks.

The confidential informant testified that he returned to the defendant's residence the following day, July 6, for the third transaction. After knocking at her door and receiving no answer, he called the defendant on the telephone to find out where she was and whether she had $40 worth of crack cocaine available to sell to him. He then sat on her porch and waited for her to return to her home. As he waited, a woman named Rita walked up to the house and engaged him in conversation, telling him to call the defendant back to tell her that she had $8.75 and wanted to buy some crack cocaine from the defendant as well. He called the defendant back, and she informed him of her location and told him to tell Rita that she would "get with [her] when she got there and take care of her." He next saw the defendant driving down the street in her Cadillac. She pulled up in the driveway, called him over to her vehicle, and gave him some crack cocaine, for which he handed her $40 in cash. As she handed him the crack cocaine that was already in her hand, he saw a baggie of crack cocaine in the console of her vehicle. He then returned to the predetermined location, where he turned the drugs and transmitter over to Officer Geddings of the Knoxville Police Department, was searched, and received his $100 payment for the transaction.

On cross-examination, the confidential informant acknowledged that in each transaction the defendant went somewhere to retrieve the drugs that she sold him. He also testified that the drugs the defendant sold him were not packaged when the defendant handed them to him.

Investigator Philip Jinks of the Knoxville Police Department testified that he was assigned to the "repeat offender squad," which did not necessarily investigate repeat

-3-

offenders but rather primarily focused on "street level drug investigations." He detailed his training and experience as a street level drug investigator and described the investigative procedure employed by his unit in response to citizen complaints about possible drug activity in the community, including their use of confidential informants to perform "cold walk-up[s]" in an attempt to make a drug buy from a suspected dealer. He testified that the confidential informant in this case came to the attention of his unit after he had provided a patrol officer responding to a call with some information. Investigator Jinks said that he then met with the informant, who expressed an interest in becoming a paid confidential informant. He said that he had used the informant in that capacity since 2005 or 2006, during which time he had participated in approximately 90 to 100 controlled buys.

Investigator Jinks testified that his investigation of the defendant began with a citizen complaint about her apartment, which prompted him to conduct surveillance at that location. During the course of that surveillance, he observed people knocking on the defendant's apartment door, going inside, staying a minute, and then leaving. He also observed the defendant coming and going from the apartment at "all hours." He then contacted the confidential informant and asked him to make the series of controlled buys from the defendant. Investigator Jinks described the process he conducted with each controlled buy, testifying that he first searched the confidential informant and his vehicle before providing him with a digital audio recorder and transmitter and $40 in cash for each transaction, that officers maintained surveillance on the informant as he drove to the defendant's apartment, that he monitored the informant's conversations with the defendant during the transactions, and that officers searched the informant and his vehicle again upon the completion of the transactions. He testified that each of the substances that the informant turned over to the officers after the controlled buys field-tested positive for cocaine and was later transported to the Tennessee Bureau of Investigation ("TBI") laboratory for analysis.

Investigator Jinks's description of each controlled buy essentially corroborated the accounts provided by the confidential informant, except that Investigator Jinks recalled that the informant was paid $100 for the first controlled buy and $80 for each of the two subsequent controlled buys. Investigator Jinks also provided the additional information that when the informant drove off after the July 5 buy, he saw the defendant walk to the automobile from which she had obtained the substances and hand the driver the money that the informant had just given her. Investigator Jinks testified that upon the completion of the July 6 transaction, he had other officers follow the informant back to the predetermined location while he maintained surveillance of the defendant's vehicle, following it to a nearby Kroger. He said that as he did so, he called for a marked patrol unit to stop the vehicle in order to make a positive identification of the defendant as the driver.

Investigator Jinks testified that on July 8, 2010, he and fellow officers went to the

defendant's apartment to conduct a search. He said that he was in plain clothes and approached the apartment from one direction while uniformed officers approached it from a different direction. He stated that the uniformed officers knocked on the apartment door as he walked around the end of the building and that the defendant came out of the apartment next to her apartment, made a motion to wave him away, and said, "The police are here. The police are here." At that point, he showed her his badge, identified himself as a police officer, and told her that they needed to talk. She then invited him inside her apartment, where he and his fellow officers conducted a search. During the search, they found a black ceramic plate with several small rocks of crack cocaine and a razor blade on it and a crack pipe and a blunt cutter. Investigator Jinks explained that the presence of the razor blade indicated to him that larger pieces of crack cocaine were being cut into smaller pieces for resale. He said he located the defendant's Cadillac down the street and inside the vehicle found the defendant's purse with a "reloadable Visa card" in someone else's name, as well as an "EBT," or food stamp, card in the name of "Rita Wampler."

Investigator Jinks testified that he took the defendant into custody and interviewed her at the Knoxville Police Department. He said the defendant told him she would buy $50 worth of crack cocaine and smoke some of it herself and sell the rest of it. She also spoke of how she had for the past two months been "doubling up" on her transactions, which meant that she would buy $50 worth of crack cocaine and try to sell the same amount for $100. She acknowledged that when she first saw Investigator Jinks outside her apartment she thought he was there to buy some crack cocaine. She also acknowledged that "Rita" had given her her EBT card in exchange for some crack cocaine.

On cross-examination, Investigator Jinks acknowledged that someone could use a razor blade to cut crack cocaine to put into a crack pipe to smoke, rather than to sell. He further acknowledged that he did not find any digital scales, plastic baggies, or drug log books inside the defendant's apartment.

Officer Michael Geddings of the Knoxville Police Department testified that he was assigned to the repeat offender unit and provided surveillance of the confidential informant during the July 6, 2010 undercover drug operation. He said he searched the informant after the transaction, placed in a sealed envelope the substance the informant purchased, which field-tested positive for cocaine, and later had it sent to the TBI laboratory for analysis.

The parties agreed by stipulation that Sergeant Josh Schaffer of the Knoxville Police Department would have testified that when he stopped the defendant's vehicle on July 6, 2010, the defendant was driving it.

Douglas Ryerkerk, an employee of Knox County School Security, testified that Belle Morris School on Washington Pike had been an elementary school for over thirty years, including during July 2010.

Craig McNew testified that he worked in the property management unit of the Knoxville Police Department and that he transported to and from the TBI laboratory the narcotics at issue in the case.

TBI Special Agent Forensic Scientist Jacob White, who analyzed the substances obtained in the July 2 and July 5 transactions, testified that they consisted of, respectively, .14 grams and .23 grams of cocaine base. The parties stipulated that the substances obtained in the July 6 transaction and the July 8 search of the defendant's home were analyzed by other TBI forensic scientists who determined that they each consisted of .1 grams of cocaine base.

James Brink, a web developer and programmer employed by KGIS, testified that he determined that the distance between Belle Morris Elementary School and the defendant's home was 572 feet.

The defendant testified that she was forty-three years old and had been using crack cocaine since 1991. She said that she obtained money to buy her drugs by shoplifting and committing forgeries and that she had "a lot" of criminal history, having pled guilty whenever she was charged with those offenses because she was guilty. She insisted, however, that she was not guilty of the crimes with which she was currently charged, which was why she had chosen to go to trial. The defendant explained that she first came into contact with the confidential informant through Rita, who lived near her and panhandled for a living. She said that Rita asked her to buy crack cocaine for someone who was at her house and that she agreed, taking the money from Rita, driving to a housing project to buy some crack cocaine, and returning to her apartment, where she gave some of the crack cocaine to Rita and kept some to smoke herself. The defendant testified that at some point the confidential informant approached her directly, telling her that Rita usually sent her to go get his drugs and he wanted to know if she had any crack cocaine for him. The defendant said she told the informant that she did not have any on her but would go get some for him.

The defendant testified that the traffic in and out of her apartment consisted of her three teenaged daughters, their friends, and her own friends and that she used the crack pipe and blunt cutter for her personal consumption of crack cocaine.

**ANALYSIS**

**I. Sufficiency of the Evidence**

The defendant first contends that the evidence is insufficient to sustain her convictions, arguing that the "minuscule amount" of drugs involved in the case, along with the fact that she handed the money she received from the confidential informant to the "actual drug dealer" in the vehicle, supports a finding that her actions consisted merely of a casual exchange. The State responds that there is ample evidence in the record for a reasonable jury to conclude that the defendant sold and delivered cocaine and possessed cocaine with the intent to sell and deliver. We agree with the State.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of three counts of the sale of less than .5 grams of cocaine within 1000 feet of a school zone and one count of possession of less than .5 grams of cocaine with the intent to sell within 1000 feet of a school zone. To sustain the sale convictions, the State had to prove beyond a reasonable doubt that the defendant knowing sold less than .5 grams of cocaine, a Schedule II controlled substance, and that the transactions occurred within 1000 feet of a school. Tenn. Code Ann. §§ 39-17-417(a)(3), (c)(2)(A), -432(b)(1). To sustain the possession conviction, the State had to prove beyond a reasonable doubt that the defendant knowingly possessed less than .5 grams of cocaine with the intent to sell and that the possession occurred within 1000 feet of a school. Tenn. Code Ann. §§ 39-17-417(a)(4), (c)(2)(A), -432(b)(1).

The defendant argues that the evidence supports a casual exchange of drugs rather than a sale. Tennessee Code Annotated section 39-17-418(a) provides that "[i]t is an offense for a person to knowingly possess or casually exchange a controlled substance, unless the substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of professional practice." A "casual exchange" generally "contemplates a spontaneous passing of a small amount of drugs, for instance, at a party. Money may or may not be involved." State v. Copeland, 983 S.W.2d 703, 708 (Tenn. Crim. App. 1998). As this court has previously explained:

> "[w]hether a transfer is a casual exchange is to be determined from all the facts and circumstances of the case. Facts and circumstances indicating that the transaction is not a casual exchange include a lack of evidence that the defendant gave the drugs to the buyer out of friendship or as a friendly gesture, no evidence reflecting anything other than a pecuniary motive for the transfer of the drugs, no prior relationship between the defendant and the buyer, and no reason for the defendant and the buyer to be together, other than for the buyer to purchase drugs."

State v. Bernard Miguel Wallace, No. W2004-02124-CCA-R3-CD, 2006 WL 16315, at *4 (Tenn. Crim. App. Jan. 3, 2006) (citations omitted) (quoting State v. Donald L. Haynes, No. E2000-00672-CCA-R3-CD, 2001 WL 416729, at *4 (Tenn. Crim. App. Apr. 24, 2001)).

The evidence, viewed in the light most favorable to the State, is more than sufficient for a rational jury reasonably to find that the transactions constituted sales rather than casual

exchanges of drugs. There was no evidence of any friendship between the defendant and the informant, of any reason that they were together other than for the sale of the drugs, or of any non-pecuniary motive on the part of the defendant for the transfer of the drugs. The evidence is also sufficient for a rational jury reasonably to find that the defendant possessed the drugs found in her home with the intent to sell them. Accordingly, we conclude that the evidence is sufficient to sustain the defendant's convictions.

## II. Testimony by Investigator Jinks

The defendant next contends that the trial court erred by allowing Investigator Jinks to testify as an expert witness. The State responds by arguing that the trial court committed no error in this matter because the State did not tender, and the trial court did not declare, Investigator Jinks as an expert witness and he did not offer any expert opinion in the case.

The record reflects that as the prosecutor was beginning to question Investigator Jinks about his background, defense counsel offered to stipulate to his "qualifications as a police officer." When the prosecutor replied that he would like to qualify him as an expert in street level drug crime, defense counsel objected on the basis that he had not been provided with any notice of expert testimony. The trial court responded that the witness was "just giving . . . his background," and that it did not know whether he would be offering an expert opinion but would rule on the issue when and if it came up. Thereafter, Investigator Jinks continued his testimony without the prosecutor ever moving that he be qualified as an expert witness or the trial court ruling on the motion. We, therefore, agree with the State that the defendant is not entitled to relief on the basis of this issue.

## III. Denial of Mistrial

Lastly, the defendant contends that the trial court erred by denying her motion for a mistrial after the State played a redacted version of her statement in which Investigator Jinks asked her who brought the gun to her apartment. The defendant argues that the information about a gun, when she was not charged with a gun offense, constituted "incredibly prejudicial and inadmissible evidence" that should have warranted a mistrial. The State responds by arguing that the trial court did not abuse its discretion in declining to grant a mistrial, asserting that "[t]he brief mention of a firearm . . . was not prejudicial and certainly did not create a manifest necessity for a mistrial."

The record reflects that defense counsel objected before the trial began to the playing of the entire interview with the defendant, arguing that it was "chock-full of stuff that doesn't belong" in the trial, including information about the defendant's probation violations, previous prison experience, and her providing the investigator with names and phone

numbers of her drug contacts. The prosecutor responded that he had not yet made the decision about whether to play the statement, but if so he would redact it to avoid any mention of the defendant's criminal history. As the State points out, defense counsel raised no objection at that point about the portion of the videotape that contained Investigator Jinks's gun discussion with the defendant, despite the fact that he had been provided with the original videotaped statement, albeit not with a redacted version or a transcript of the portions that the State intended to play.

The videotaped statement was later played for the jury during Investigator Jinks's testimony, with the prosecutor apparently fast-forwarding over objectionable parts and stopping at various points to ask Investigator Jinks to explain the terminology.[1] When the videotape reached a portion of the interview in which Investigator Jinks asked the defendant, "Who brought the gun in?" defense counsel objected and the following bench conference was held:

> [DEFENSE COUNSEL]: Here's my problem with this. Now we're going to put in the gun stuff, and there's no gun involved.
>
> THE COURT: I can't – I can't –
>
> [DEFENSE COUNSEL]: She – now we're –
>
> THE COURT: I can't hardly understand what they're talking about.
>
> [DEFENSE COUNSEL]: Well, for one, this is a terrible quality. The quality of the copy I was given is much better than this. They've digitized it, and that's what's making it so screechy and bad, but now we're talking about who brought the gun over. There's no allegation of gun in this charge–this thing. Let's just beat her up with it.
>
> [PROSECUTOR]: And they clarify all that. There wasn't a gun – there's been a gun in the past, and they're not trying to charge her with a gun. They found some bullets in this search. There wasn't any gun found.
>
> [DEFENSE COUNSEL]: Which makes it irrelevant as it shouldn't be in trial.

---

[1] Defense counsel states in his brief that at trial a transcript of the interview was "joined to the video" with the "text running below the video." However, neither the original copy of the videotape, which was admitted for identification purposes only, nor the redacted version, which was admitted as a trial exhibit and in which the conversation about the gun was removed, contains any text of the interview.

That's why I objected to playing this tape, and I haven't been provided any redacted version.

THE COURT: I mean, what is she saying right there? What is he saying there?

After counsel provided the words for the court, the court suggested that they take a ten-minute break and "move past the gun part." During the break, defense counsel requested a mistrial, arguing that the statement about the gun was inflammatory, irrelevant, and unfairly prejudicial to his client's case. The trial court ruled that the question about the gun was irrelevant, ordered that the State fast forward past all mention of the gun and bullets before resuming the playing of the videotape, and denied the request for a mistrial. The court originally expressed its intention to issue a curative instruction to the jury to disregard the conversation about the gun but changed its mind after defense counsel requested that no such instruction be given so as not to draw the jury's attention to the matter.

The decision of whether or not to declare a mistrial lies within the sound discretion of the trial court. State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. See id.; State v. Jones, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999); Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting Arnold, 563 S.W.2d at 794). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. Land, 34 S.W.3d at 527. This court will not disturb the trial court's decision unless there is an abuse of discretion. Id.

We agree with the State that the defendant has not shown any manifest necessity for a mistrial based on the brief, almost inaudible, mention of a gun during the playing of the videotaped statement. We conclude, therefore, that the trial court did not abuse its discretion in denying the mistrial and that the defendant is not entitled to relief on the basis of this issue.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE